**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

    Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| ALEXANDRA JOHNSON,<br><br>Plaintiff,<br><br>v.<br><br>MULTNOMAH COUNTY, CITY OF PORTLAND, JOHN DOES 1-10,<br><br>Defendants. | Case No.<br><br><br><br>COMPLAINT<br><br>Civil Rights Action (42 U.S.C. § 1983); and Battery (State Tort)<br><br>JURY TRIAL DEMANDED |

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. Plaintiff Johnson, along with tens of thousands of their fellow community members, and millions of other people around the world, have taken to the streets to protest white supremacy and police violence in the United States generally and in Portland specifically. Defendants Multnomah County, by and through its agents, Multnomah County Sheriff's Office ("MCSO"), and City of Portland, by and through its agents, Portland Police Bureau ("PPB"), acted in concert to respond with unlawful and indiscriminate violence against demonstrators outside of the Multnomah County Justice Center ("Justice Center"), which also houses the Multnomah County Detention Center ("MCDC"), in the law enforcement agencies' continued effort to silence speech. Because of this pattern and

practice and the intentional conduct of a PPB officer or MCSO deputy, Plaintiff was shot in the hand causing her serious injury. Plaintiff is entitled to damages, and an award of attorneys' fees and costs.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4). The court has supplemental jurisdiction over the State tort claims pursuant to 28 U.S. Code § 1367(a).

## VENUE

2. Venue is proper within the District of Oregon because a substantial part of the events giving rise to this claim occurred in this judicial district, and all parties reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County, Oregon.

## PARTIES

3. Alexandra Johnson, Plaintiff, at the time of filing and all material times, was a citizen of the State of Oregon.

4. Defendant Multnomah County ("County") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The County runs the Multnomah County Sheriff's Office ("MCSO"). On information and belief, each and every decision to indiscriminately use "less lethal" weapons against Plaintiff was made and or ratified by a sufficiently high level as to be policy decision of Multnomah County. On information and belief, the MCSO deputies who used "less lethal" weapons against Plaintiff were acting pursuant to the practice or policy of Multnomah County in coordination and concert with Defendant City of Portland.

5.    Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau (hereinafter, "PPB"). On information and belief, each and every decision to indiscriminately use "less lethal" weapons against Plaintiff was made and or ratified by a sufficiently high level as to be policy decision of the City. On information and belief, the PPB members who used "less lethal" weapons against Plaintiff were acting pursuant to the practice or policy of the City in coordination with Defendant Multnomah County.

6.    Plaintiff does not know the name of Defendant John Doe 1, and thus sues them under a fictitious name. John Doe 1 is a law enforcement officer who, under color of law and coordination between Defendants, shot at and injured Plaintiff. They are sued in their individual capacity.

7.    Plaintiff does not know the names of Defendants John Does 2-10, and thus sues them under fictitious names. John Does 2-10 are any City and County employees who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in Plaintiff's deprivation of civil rights as hereinafter alleged, or furthered the pattern and practice of unconstitutional conduct hereinafter alleged. They are sued in their individual capacities.

**GENERAL ALLEGATIONS**

**I.    Introduction**

8.    On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not

breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

9. For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

10. Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show that the police in this country are out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, kettling whole groups of protestors only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protestors, shooting kinetic impact munitions into crowds of people who are doing nothing but protesting peacefully, and using massive amounts of tear gas in a massive systemic effort to stop people from protesting police violence. These violent police responses have only reinforced the need for the call for change demanded by protestors.

**II. Portland**

11. By May 29, 2020, Portlanders had begun demonstrating in the streets demanding justice for George Floyd and demanding an end to police violence. MCSO and PPB, like law enforcement agencies throughout the country, have met these demands with violence against protesters.

12.     A focal point of conflict between MCSO, PPB, and protestors has been the Multnomah County Justice Center, in downtown Portland, which was, for many weeks, surrounded by fencing. The building houses PPB's central precinct, MCDC operated by MCSO where hundreds of humans—disproportionately Black—are housed in small cage-like cells, and a small number of courtrooms where the business of the criminal legal system perpetuating these racial inequalities continues every working day. It is, in short, a perfect symbol of the harms the protestors have sought to address.

13.     MCSO and PPB were determined to keep the protesters away from protesting around the Justice Center by closing public streets, erecting fences, and guarding it with lines of law enforcement officers wearing armor, helmets, and gas masks who were stocked with and using weapons against the protesters. Many nights of protests around the Justice Center culminated in law enforcement from the City and County using a variety of weapons against the protesters, including indiscriminately spraying demonstrators with tear gas, plastic bullets, rubber bullets, pepper balls, blast balls, flash bangs, and other impact munitions, while launching aerial munitions into the air above the protesters' heads.

14.     After the District Court for the District of Oregon entered a Temporary Restraining Order on June 9, 2020, in the case *Don't Shoot Portland, et. al. v. City of Portland, et. al.*, USDC of Or. Case No. 3:20-cv-00917-HZ, limiting PPB's use of tear gas on protestors, upon information and belief MCSO and PPB escalated their use of rubber bullets, pepper balls, blast balls, flash bangs, and other impact munitions on police accountability protesters in an indiscriminate and otherwise unlawful manner.

15.     Upon information and belief, Defendants City of Portland and Multnomah County have engaged in a mutual aid compact or other similar agreement that coordinates MCSO and PPB

law enforcement actions to act in concert to clear to individuals participating in protest events from the area around the Justice Center.

**III. Impact Munitions**

16. Defendants use a variety of so-called "riot control" weapons. Among those weapons used against Plaintiff and other protesters, MCSO and PPB use an 18 mm, 15-round capacity, compressed-air-propelled, shoulder fired weapon called an FN303. MCSO and PPB use the FN303 to deploy kinetic impact munitions with and without oleoresin capsaicin ("OC"), a chemical irritant, and with or without marking paint. MCSO and PPB use the FN303 impact munitions against protestors in both unconstitutional targeted shots and in an indiscriminate manner.

17. The use of FN303s in crowd management settings has led to the death of protesters, for example in Boston.[1] This fact has led some police departments to cease use of FN303s altogether, like the Boston Police Department, which repurposed these weapons by melting them into sewer caps.[2] During the recent protests following George Floyd's murder, projectiles fired from FN303s have resulted in the serious maiming of many individuals, such as Plaintiff, as they have been used by law enforcement around the country and world for decades.[3]

18. In the past and during the present protests, Defendants' law enforcement officers have fired these impact munitions, particularly the FN303, indiscriminately and in an unlawful targeted manner into crowds of passively resisting, or other peaceful protesters standing in a crowd yelling and chanting, both before and after PPB and MCSO has declared an unlawful

---

[1] The New York Times, *Boston Police to Destroy Pepper-Spray Guns* (Feb. 23, 2007), available at https://www.nytimes.com/2007/02/23/us/23pepper.html.
[2] *Id.*
[3] *See* Rohini J. Haar, et al., *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review*, BMJ Open (Dec. 5, 2017), available at https://bmjopen.bmj.com/content/7/12/e018154 (reviewing injuries to protesters from law enforcement use of kinetic projectiles from 1990 to 2017).

assembly/civil disturbance, leaving broken bones, large welts and bruises, and other similar short-term, long-term, and permanent injuries. Protestors outside of the Multnomah County Justice Center attest to being fired upon and hit by such munitions by law enforcement standing at the top of the stairs across the street despite having not engaged in any behavior that was criminal, let alone threatened anyone's life or safety.

## FACTUAL ALLEGATIONS

19.     Alexandra Johnson attended the protests in Downtown Portland beginning on May 31, 2020, because Black Lives Matter and because she wants to make her community safer and more equitable.

20.     On the night of June 15, 2020, Ms. Johnson was protesting in the area around the Justice Center where hundreds of people were gathered to protest police violence against the community. She was chanting with the crowd, and she was yelling at the Justice Center and the law enforcement officers there, but she did not attempt to breech the fence nor throw any projectiles. Although the police announced that it was unlawful to point a laser at officers, Ms. Johnson did not have a laser and was merely chanting with the crowd, yelling, and livestreaming some of the protest from her phone.

21.     As discussed above, the County and/or the City of Portland had erected fencing around the Justice Center. The fence itself became a focal point for protest activities, as it emblemized the lack of access to the Courts and to justice for the public. The fences around the Justice Center were erected in many positions around that time, but on June 15, 2020, the fence was either on the sidewalk along SW Third Ave in front of the Justice Center or just beyond the sidewalk and on the street.  The fence kept protesters at ground level, while MCSO deputies and/or PPB members stood above the crowd on elevated steps of the Justice Center. From their elevated

position, officers aimed their weapons down into a crowd and from a distance of around 30-100 feet, increasing the likelihood that more sensitive body parts would be hit by their weapons.

22.  Ms. Johnson was standing back, away from the fence with many protesters in front of and behind her. Officers targeted her with multiple spotlights, including a powerful light pointing at her camera for 30 seconds straight. The light hurt her eyes even though she was in the street, away from the building, behind the fence, and behind others in the crowd, making her more than 50 feet away from the police. When she stopped filming, the police stopped targeting her with the lights. After she moved to the intersection of SW 3rd and SW Main, suddenly and without warning, officers stationed approximately 10 feet above the crowd on the open, columned walkway or portico of the Justice Center began shooting "less lethal" munitions into the crowd and about 15 feet from her. She began filming again and announced to the livestream that police had started firing into the crowd indiscriminately and without warning.

23.  A moment later, Plaintiff was still filming when a law enforcement officer, John Doe 1, who was on the portico about 30 feet away from Plaintiff, aimed directly at her, shot at her, and hit her with what she believes to be an FN303. The munition ripped open her left hand and caused Plaintiff immediate pain and ongoing injury.

24.  Protester medics nearby attempted to wash her wound and stop the bleeding by applying pressure and wrapping her hand. They also helped her calm herself and her breathing and helped to reduce her panic. About five minutes later, the police declared an unlawful assembly and ordered the crowd to disperse or be subject to arrest or force. As she tried to leave the area, the law enforcement officers began using flashbang grenades, which exploded just feet away from her. The crowd of protestors was also trying to disperse calmly and safely while the officers continued to use explosive grenades and smoke grenades.

25.     Ms. Johnson went to the hospital later that night, where she received three stitches. Days later, she removed the bandage and the swelling continued; she knew that her injuries were extensive and returned to the doctor. An x-ray revealed a broken bone in her hand. She was unable to close her fist and was in significant pain while doing small tasks, like pulling up her own pants or lifting a cup of coffee and had to resort to only using her other hand. She also had major bruising on the palm of her hand and inside of her thumb.  Her injuries made it difficult for her to perform her job duties.

26.     Ms. Johnson has not recovered from her injuries caused by the kinetic impact munition. She engages in physical therapy and will likely have to continue to do so to regain and then retain as much of the full use and strength of her hand as might be possible.

27.     Ms. Johnson was physically harmed and frightened by law enforcement's use of "less lethal" weapons against her.

28.     As a result of the above, she feels fearful of police.

**Claim 1: Fourth Amendment – Excessive Force/Unlawful Seizure – Individual Liability**
**(42 U.S.C. § 1983)**

29.     Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

30.     It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive and unnecessary.

31.     In taking the actions described above, including but not limited to shooting Plaintiff—a person who was unarmed, passively-protesting, standing still, and video-recording—with a kinetic impact munition, Defendant John Doe 1 intentionally violated Plaintiff's right to be free from unlawful and unreasonable seizures guaranteed by the Fourth Amendment to the United States Constitution.

32. Defendant John Doe 1 violated rights held by Plaintiff which were clearly established, and no reasonable official similarly situated to John Doe 1 could have believed that his or her conduct was lawful or within the bounds of reasonable discretion. Defendant John Doe 1 therefore does not have qualified or statutory immunity from suit or liability.

33. The actions of Defendant John Doe 1, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendant John Doe 1, in their individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

34. John Does 2-10 participated in Plaintiff's injury by failing to train, supervise, and discipline John Doe 1, and/or by directing John Doe 1 to fire upon Plaintiff. Their direct participation in the injury caused Plaintiff's rights to be violated.

35. The unreasonable seizure and excessive force used on Plaintiff by Defendants was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and an ongoing injury to Plaintiff's left hand. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

**Claim 2: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability**

**(42 U.S.C. § 1983)**

36. Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

37. Multnomah County and City of Portland act in concert to clear protests from around the Justice Center. Both Defendants have official policies allowing the use of "riot control" and "less lethal" weapons against a crowd. These policies do not properly follow the *Graham v. Connor* Fourth Amendment standard regulating the use of force against individuals. The policies allow

for the unlawful and indiscriminate use of force against a crowd of people, including those engaging in passive resistance, in violation of the Fourth Amendment.

38. Alternatively, even if the policies themselves are constitutional, PPB and MCSO's actual practice and custom is to allow the use of "riot control" and "less lethal" weapons in unlawful manners against a crowd both before and after an "unlawful assembly" and/or a "civil disturbance" has been declared, even when a substantial number of people in that crowd, or even the great majority of that crowd, are obeying law enforcement orders, engaged in no resistance, or engaged in only passive resistance to an order. Defendants' training has not sufficiently protected against and prevented unlawful uses of force such as those used against Plaintiff. In fact, at least one training within the few years before Plaintiff was harmed advocated for police to harm protesters and trained officers on incorrect law that allowed for officers to use force against passive protesters.

39. The City and the County have tacitly and explicitly authorized the use of indiscriminate crowd control munitions on crowds of protestors by justifying or condoning uses of similar tactics, including "less lethal" weapons shot indiscriminately into crowds of protestors, at protests on these dates and knew or reasonably should have known this would lead to constitutional violations alleged herein.

40. Defendants, acting pursuant to this policy, custom, or practice, unlawfully used "less lethal" weapons against Plaintiff as alleged above, causing her injuries. The unreasonable seizure and excessive force of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and an ongoing injury to Plaintiff's left hand. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

**Claim 3: First Amendment – Unlawful Pattern and Practice – Municipal Liability**

41. Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

42. Plaintiff was engaged in constitutionally protected acts of free speech, including public demonstration opposing racism and police violence against Black people. Plaintiff will continue to do so in the future.

43. The First Amendment protects persons from unlawful curtailment of expressive conduct, assembly, and associations with one another.

44. Defendant John Does 1-10's retaliatory motive was the but-for cause of Plaintiff's injuries. By shooting at and injuring Plaintiff while and because she protested and recorded the police violence, Defendants chilled Plaintiff's political speech, violating her First Amendment rights.

45. Defendants' use of force against Plaintiff for engaging in First Amendment protected activity, and an effort to in deter future similar activity, evidences a pattern and practice of unconstitutional conduct.

46. Defendants have a custom and practice of using militarized force against anti-police protestors, as demonstrated by the use of tear gas and "less lethal" weapons against those protesting outside the Justice Center, a significant symbolic representation of the issues being protested. The Defendants' use of force was intended to unlawfully punish a group of protestors individually and *en masse* for their political speech and to deter further similar expressions of speech. The supervisory decision to fire "less lethal" weapons indiscriminately or otherwise unlawfully and unconstitutionally into a crowd of protestors demonstrating outside the Justice Center was made in retaliation for the protestors' protected speech condemning the police at the

symbolic embodiment of the protest subject matter and to chill the expression of further similar speech.

47. The above-described conduct was a proximate cause of harm to Plaintiff. The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

### Claim 5: Battery

### (State Tort)

48. Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

49. Plaintiff submitted a timely claim nine days after the incident at issue for damages for the injuries alleged herein in *Don't Shoot Portland, et. al. v. City of Portland, et. al.*, USDC of Or. Case No. 3:20-cv-00917-HZ, Dkt. 38, filed June 24, 2020, that put Defendants, who were also named defendants in that action, on notice of the events, possible claims, and injuries Plaintiff now raises here. Judge Hernandez granted Plaintiff's motion to sever her damages claim from that action with the expectation that she would file this new lawsuit, Dkt. 239.

50. As described above, agents of the Defendants did unlawfully intend to come into physical contact with Plaintiff and did come into contact with Plaintiff. Defendants' unlawful and intentional contact with Plaintiff was offensive.

51. The battery against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and an exacerbated injury to her left hand. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

///

**REASONABLE ATTORNEY'S FEES AND COSTS**

52. 42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

53. Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

**CONCLUSION**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

    A.    For economic, non-economic, and punitive damages in an amount to be determined at trial;

    B.    For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

    C.    Such other relief as the court deems just and proper.

DATE: June 14, 2022.

*/s/ Franz Bruggemeier*
Franz Bruggemeier, OSB #163533
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
PO Box 5248
Portland, OR 97208
*ATTORNEY TO BE NOTICED*